IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

F I L E D

JUL - 9 2012

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

JORGE LUIS REYES, SR.,            )
                                  )
    Petitioner,                   )
                                  )
v.                                )     Civil Action No. 3:09CV23–HEH
                                  )
LORETTA K. KELLY,                 )
                                  )
    Respondent.                   )

## MEMORANDUM OPINION
### (Denying § 2254 Petition)

Petitioner, a Virginia inmate proceeding with counsel, filed this petition for a writ

of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges his conviction in the

Circuit Court of Henrico County ("the Circuit Court") for murder and use of firearm in

the commission of that offense. For the reasons set forth below, the § 2254 Petition will

be denied.

### I. Procedural History of the § 2254 Proceedings

**A.    The Initial § 2254 Proceedings**

In his § 2254 Petition, which was filed *pro se*, Petitioner asserted that he was

entitled to relief upon the following grounds:

| | |
|---|---|
| Claim I | The Circuit Court erred in granting an instruction on flight. |
| Claim II | Petitioner was denied his federal and state constitutional rights because:<br>A.    The Circuit Court erred in denying Petitioner the right to present evidence; and,<br>B.    Petitioner was denied a jury of his peers. |
| Claim III | The Circuit Court erred in admitting evidence of Petitioner's prior handling of firearms. |

Claim IV     The Circuit Court erred in admitting the state-of-mind declarations of the victim.

Claim V     The prosecutor engaged in misconduct during closing argument.

Claim VI     Petitioner was denied the effective assistance of counsel because:
A. Counsel failed to challenge the credibility of the police witnesses;
B. Counsel failed to obtain the presence of a key witness;
C. Counsel failed to move for a continuance;
D. Counsel failed to subpoena statements of witnesses made to the police;
E. Counsel failed to object to references in the prosecutor's closing argument to evidence that was not presented at trial; and,
F. Counsel failed to offer a proper instruction on involuntary intoxication.

By Memorandum Opinion and Order entered on September 25, 2009, the Court denied Respondent's Motion to Dismiss and directed the parties to file further briefing. *Reyes v. Kelly*, No. 3:09CV23–HEH, 2009 WL 3109856, at *6 (E.D. Va. Sept. 25, 2009). Thereafter, Petitioner retained counsel. Respondent filed further briefing and renewed her request to deny the § 2254 Petition. Petitioner filed his opposition to the denial of the § 2254 Petition.[1]

By Memorandum Opinion and Order entered on September 20, 2011, the Court dismissed Claims II, V, and VI. *Reyes v. Kelly*, No. 3:09CV23–HEH, 2011 WL 5149975, at *15 (E.D. Va. Sept. 20, 2011). The Court further found that Petitioner had

---

[1] At the request of the parties, the Court temporarily stayed any ruling on the § 2254 Petition while Petitioner pursued a motion to test biological and non-biological evidence in the Virginia courts. Although Petitioner pursued a post-conviction motion to test biological and non-biological evidence in the Virginia courts, he apparently has not pursued a petition for a writ of actual innocence under section 19.2–327.10 of the Virginia Code.

procedurally defaulted the constitutional aspects of Claims I, III, and IV. *Id.* at \*4. The Court noted,

> Petitioner has not asserted any cause that would excuse his default. Nevertheless, scattered throughout his *pro se* submissions, Petitioner makes disjointed arguments as to his innocence. Given the different versions of events Petitioner provided to the police and the state proceedings which have occurred since the § 2254 Petition was filed, it is difficult to discern the theory and evidence on which Petitioner relies to prove his innocence. To the extent Petitioner wishes the Court to consider a claim of actual innocence, he must submit a brief, *through counsel*, within twenty-five (25) days of the date of entry hereof.

*Id.* (internal citation and footnote omitted; second emphasis added). The Court warned Petitioner that, "[a]bsent a sufficient showing of actual innocence, Claims I, III, and IV will be dismissed on the ground that they are procedurally defaulted." *Id.*

**B.     Proceedings Subsequent to the Entry of the September 20, 2011 Memorandum Opinion and Order**

**1.     Submissions by Counsel**

By Memorandum Order entered on October 25, 2011, the Court granted Petitioner until November 8, 2011, to submit a brief addressing his assertion of actual innocence. Petitioner, through counsel, submitted a Memorandum of Law on Actual Innocence (Dk. No. 47) on November 7, 2011 and an Amended Memorandum of Law on Actual Innocence (Dk. No. 49) on November 13, 2011. On November 15, 2011, Respondent filed her opposition. (Dk. No. 51.)

### 2.   Petitioner's *Pro Se* Submissions

On November 22, 2011, Petitioner and his current wife submitted an Addendum to Amended Memorandum of Law on Actual Innocence.  In that submission, Petitioner alleges, *inter alia*, that the vehicle in which the homicide occurred had been detailed only a few hours prior to the homicide.[2]

On January 20, 2012, Petitioner filed a Motion to Withdraw Counsel of Record, Maureen L. White.  Petitioner represented that the time Ms. White had "committed to Petitioner's case had far-exceeded her original expectation.  Therefore, any further representation by Ms. White . . . *may* require additional financial compensation, which Petitioner is unable to provide." (Mot. Withdraw 2–3.)[3]  Additionally, Petitioner asserted that he had discovered some errors in documents that Ms. White had filed with the Court. Petitioner, however, acknowledges, that "most of the errors have been corrected." (*Id.* at 3.)  On January 22, 2012, Ms. White filed a response to that motion wherein she denied the substance of Petitioner's allegations, but joined in Petitioner's request to allow her to withdraw.

On January 23, 2012, Petitioner filed a Motion for Leave of Court to File Supplemental Brief in Support of Writ of Habeas Corpus.  Thereafter, on January 30, 2012, Petitioner filed a Supplemental Brief in Support of Habeas Corpus ("Supplemental Brief").  In that Supplemental Brief, Petitioner seeks to amend his § 2254 to add three

---

[2] The Court addresses this assertion in footnote 16.

[3] The Court employs the page numbers assigned to this document by the Court's CM/ECF docketing system.

new claims which he alleges did not exist until after he filed the present § 2254 Petition.

Additionally, Petitioner requests that the Court "please reference the *details* in Civil

Action No. 3:11cv435HEH." (Supplemental Brief 2.) The habeas petition in that matter,

along with attachment, spans 158 pages.

### 3.    Resolution of the Recent Submissions

The Court's discussion of Petitioner's claim of innocence will largely be confined

to the submissions by counsel on that subject.[4] *See United States v. Tracy*, 989 F.2d

1279, 1285 (1st Cir. 1993). After evaluating Petitioner's claim of innocence, the Court

will address Petitioner's attempt to amend his § 2254 Petition to add additional claims.

Contemporaneous with the dismissal of the present action, the Court will grant the

Motion to Withdraw and allow Ms. White to withdraw as counsel of record for Petitioner.

### II. Standard for Establishing Actual Innocence

"Claims of actual innocence, whether presented as freestanding ones, *see Herrera*

*v. Collins*, 506 U.S. 390, 417 (1993), or merely as gateways to excuse a procedural

default, *see Schlup v. Delo*, 513 U.S. 298, 317 (1995), should not be granted casually."

---

[4] The Court previously emphasized that it would not cull through multiple submissions to ascertain the theories and evidence that Petitioner alleges demonstrate his innocence. *See Reyes*, 2011 WL 5149975, at *4. Thus, the Court stated that its "consideration of Petitioner's claim of actual innocence will be limited to the forthcoming brief from counsel for Petitioner." *Id.* at *4 n.6. Petitioner has not requested that the Court disregard the briefs submitted by counsel in favor of his *pro se* submissions. Moreover, Petitioner has not sought an extension of time to submit additional documents, much less explained why excusable neglect prevented him from removing counsel and filing any *pro se* submission on the subject of his innocence prior to November 8, 2011. Nevertheless, the Court has reviewed Petitioner's recent *pro se* submissions. Petitioner's *pro se* submissions do not alter the Court's conclusions with respect to Petitioner's claim of actual innocence.

*Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (parallel citations omitted).  Here, the Court reviews Petitioner's claim under the more lenient standard for gateway claims because Petitioner's actual innocence claim would allow the Court to consider his otherwise procedurally defaulted constitutional claims.  A gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.  "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.*

If a petitioner meets the burden of producing new, truly reliable evidence of his innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'" and determines whether the petitioner has met the standard for a gateway claim of innocence. *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup*, 513 U.S. at 327–28).  The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327–28).  "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." *Hill v. Johnson*, No. 3:09cv659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352–53 (8th Cir. 1997); *Feaster v. Beshears*, 56 F. Supp. 2d 600, 610 (D. Md. 1999)).

6

In light of the foregoing principles, it is appropriate to recount the substantial evidence of Petitioner's guilt that was presented at trial, prior to assessing the reliability and adequacy of Petitioner's new evidence of innocence.

### III.  Evidence from Trial

Someone shot and killed Ruth Harris ("Harris") shortly after midnight on April 22, 2004.  Although there was no direct evidence of Petitioner's guilt, the prosecution presented a compelling case that Petitioner had murdered Harris.  Petitioner then, as now, suggests he had a loving relationship with Harris and that some third party or parties killed her.  Petitioner's argument remains unconvincing.

### A.     The Initial Encounter with Police

The Court of Appeals of Virginia aptly summarized the evidence regarding Petitioner's interactions with the police on the night of Harris's murder as follows:[5]

> On April 22, 2004 at approximately 1:00 a.m., Henrico County Police Officers Mark Domnick and Mike Taylor were in a vehicle at the parking lot of a restaurant at Laburnum Avenue and Meadowbridge Road. The officers saw a man in a white SUV blowing his horn and screaming as he traversed the Richmond Henrico Turnpike into the parking lot.  The man, subsequently identified as appellant, continued to scream and wave his arms after he stopped near the officers.
> Domnick approached appellant's vehicle, reached in, and pulled the keys from the ignition.  As he did so, he saw the body of Ruth Harris on the floorboard of the front passenger seat. Police checked her vital signs and discovered Harris was dead.

---

[5] Because any findings of fact by the Court of Appeals of Virginia are presumed correct absent clear and convincing evidence to the contrary, that decision figures prominently in this Court's opinion. *See* 28 U.S.C. § 2254(e)(1).

*Reyes v. Commonwealth*, No. 1660–05–2, 1 (Va. Ct. App. May 3, 2006). Domnick

observed quantities of shattered glass from the passenger's side and driver's side

windows in and about the vehicle. (Trial Tr. 105–06.)

### 1.    Petitioner's First Version of the Shooting

> Officers Taylor and Wagoner pulled appellant from the vehicle, and
> Domnick directed the other officers to handcuff appellant and to seat him
> on the curb. Appellant was distraught, and was also intoxicated.   One
> officer testified, "His eyes were glassy and watery, speech slurred, hard to
> understand, just a real heavy odor of alcohol coming from his person," and
> that as a result it was difficult to understand what appellant was saying.
> Appellant kept repeating certain phrases, such as "they shot her, they
> shot her," and repeated terms of endearment, such as "my baby." Appellant
> eventually claimed a man named "Buddy" had shot Harris. Appellant told
> Taylor repeatedly that someone had shot his girlfriend and that "somebody
> had gotten out of the car and shot at them while he was still sitting in the
> vehicle." Taylor acknowledged that appellant had indicated there was more
> than one individual involved.

*Reyes*, No. 1660–05–2 at 1–2.   Thus, in his first version of the shooting, Petitioner

asserted that the shots had come from outside of the car, Buddy was the shooter, and that

Buddy had a companion. (Trial Tr. 119, 123.)[6]

### 2.    Petitioner's Second Version of the Shooting

> At approximately 1:13 a.m., Henrico Police Officer Jeff Ensor
> arrived. Ensor began a crime scene log and an incident crime report by
> questioning appellant. Appellant repeated his statement that a man named
> Buddy had shot Harris. Appellant stated he contacted Buddy by driving
> around the area, and found him on Second Avenue. He agreed to give
> Buddy a ride. While in the car, Buddy brandished a firearm, exited the car,
> and started shooting into the vehicle. When appellant spoke, he did not

---

[6] Officer Taylor initially indicated that Petitioner had stated that "they tried to rob him . . . from
the back seat." (Trial Tr. 123.) However, upon reviewing his contemporaneous notes, Officer
Taylor acknowledged that Petitioner had not stated that someone had tried to rob him from the
back seat. (*Id.* at 127.)

mention a second suspect to Ensor. Ensor could not complete a physical description form for Buddy, because appellant, though conscious, suddenly stopped responding to questions.

*Reyes*, No. 1660–05–2 at 2. In Petitioner's second version of the events, Petitioner indicated only Petitioner, Buddy, and Harris had been in the vehicle on the evening of the shooting. (Trial Tr. 141.)

### 3. Petitioner's Third Version of the Shooting

Investigator Lowrey also questioned appellant. Appellant told Lowrey he was with Harris at his home on Second Avenue, and decided to leave and get dinner. While the two were driving, they saw Buddy. Appellant asked Buddy if Buddy had any drugs. Buddy did not, but asked appellant to give him and his companion a ride. Appellant agreed, and Buddy and the companion entered his car. Buddy sat behind appellant, who was driving. The companion sat behind Harris. Appellant drove by the location where he normally dropped off Buddy, so he attempted a U-turn. At that point, Harris yelled, "He's got a gun." Appellant turned and saw a small semi-automatic in Buddy's hand. Buddy and Harris struggled for the gun while the vehicle was moving. A round went off, and then Buddy jumped out of the car and shot from outside the vehicle.

*Reyes*, No. 1660–05–2 at 2. In Petitioner's third version, for the first time, Petitioner claimed that a shot had been fired from inside the car. (Trial Tr. 196.) Petitioner further indicated that two shots were fired from outside of the vehicle, and that he thought one of those shots had struck Harris. (*Id.* at 197.) Petitioner made several attempts to get away from Investigator Lowery[7] and asserted that he did not need to provide the police information because he was going to take care of this himself. (*Id.* at 187.)

---

[7] The Court of Appeals of Virginia and the Circuit Court utilize two different spellings for Investigator Lowery's name. This Memorandum Opinion employs the spelling of Lowery's name that appears in the trial transcript.

> At the hospital, a forensic nurse photographed red marks on appellant's upper back and shoulder, and abrasions on his face, hands, right wrist, and right elbow. While police were at the hospital, Sheila Harris–Minor arrived and introduced herself as appellant's fiancée. The vehicle appellant was driving was registered in her name.

*Reyes*, No. 1660–05–2 at 3. Petitioner told Investigator Lowery that both the victim and Sheila Harris-Minor were his fiancées. (Trial Tr. 202.)[8]

### 4.   Petitioner's Fourth Version of the Shooting

The day after the murder, Investigator Hanna interviewed Petitioner. The story of the shooting that Petitioner told Investigator Hanna was largely identical to the story he told Investigator Lowery except Petitioner stated that two shots were fired in the car. (*Id.* at 578.) Petitioner, however, still asserted that he did not realize Harris had been shot until the shots were fired from outside of the vehicle. (*Id.*) Additionally, for the first time, Petitioner said that, when he was sitting with the police by the McDonalds after the murder, he thought he saw someone who looked like Buddy's skinny companion. (*Id.* at 579.)

### B.   Harris's Relationship with Petitioner

Petitioner told Investigator Lowery, on the night of the murder, that Petitioner and the victim "were talking about getting married just tonight." (*Id.* at 188.) Although Petitioner tried to convey the impression to the police and the jury that he had a tender, romantic relationship with Harris, the evidence reflected otherwise:

---

[8] Petitioner spent the night of April 20th and the morning of April 21st, 2005, in a hotel room with Harris-Minor. (Trial Tr. 546.)

According to Bette Douglas, a friend of Harris's, Harris arrived at Douglas's residence in the early morning two days prior to her death. Douglas stated that Harris was upset and had a black eye when she arrived. Upon her arrival, the two chatted, and Harris went to sleep on the sofa. Douglas claimed Harris told her "she was scared of [appellant]." Later, appellant came to Douglas's home, and Harris left with him willingly. There was nothing remarkable about appellant's demeanor.

Harris's sister, Ada Anderson, testified that Harris had stayed with her for three weeks approximately one month prior to her death. According to Anderson, she did so "to get away from appellant." While there, Harris told her sister "she was afraid of [appellant], and she wanted to get away from him" and that at times appellant would act weirdly. In the evening before the murder while Harris was at work, she told co-worker Samantha Wright that "she was ready to get out of the relationship. She was scared."

*Reyes*, No. 1660-05-2 at 4 (alterations in original).

Particularly damning for Petitioner is evidence reflecting his volatile disposition towards Harris in the hours immediately preceding her murder.[9]

After leaving work [on the night of her murder], Harris went to the home of her daughter, Detra Johnson, arriving at 9:15 p.m. Harris was anxious to return appellant's car because "he had been acting like crazy about his car, her using his car." As Johnson spoke with her mother, she saw her mother had neither a black eye nor a contusion on her left cheek.

After leaving her daughter's house, Harris went to appellant's room. According to appellant, while there, they argued over her smoking a marijuana cigarette and the fact Harris believed appellant had been sleeping with another woman. Appellant became upset, knocked a joint out of her mouth, and left to calm down. When he returned, appellant heard Harris speaking to neighbor Debbie Allen about their domestic difficulties.

Allen testified Harris awoke her while she was watching a television show between 12:30 and 1:00 a.m. [Harris "looked real upset." (Trial Tr. 259.)] Allen asked her, "Why don't you leave him," to which Harris

---

[9] The following evidence also reflects that Petitioner lied when he told Investigator Lowery that he and the victim "had been home all afternoon, drinking, smoking marijuana and crack, and having sex." *Reyes*, No. 1660–05–2 at 3.

responded, "He won't leave me." *Id.* at 4–5.[10]   At that point, Petitioner came upstairs and he was "mad." (Trial Tr. 261.)   Petitioner yelled, "[D]on't nobody up here pay your bills; and bring your MF[11] on downstairs." (*Id.*)   Harris then went downstairs followed by Petitioner. (*Id.* at 262.)   Allen then heard Petitioner talking loudly to Harris and then heard the door to Petitioner's room slam. (*Id.* at 262–63.)   Allen heard "something later hit like a thump." (*Id.* at 262.)   When Allen had been talking to Harris, she had not noticed any marks or injuries to Harris's face. (*Id.* at 263.)

Within one-half hour of Petitioner cursing at Harris, Petitioner drove into a restaurant parking lot with Harris's dead, bruised body in the car, claiming that Harris had been shot by a drug dealer named Buddy.

Harris died of a gunshot wound to the back of her head from a .380 caliber bullet.   Based on the lack of stippling, the presence of heat artifact, and the gunshot powder in the wound, the forensic examiner concluded the gunshot was made from close range.   There were no defensive wounds on her hands or arms, though the absence of such wounds would not negate the possibility of a struggle just prior to death.

The Commonwealth introduced testimony from three witnesses regarding appellant's ownership of firearms.   Marvin Green testified that he saw appellant with a gun in the weeks prior to the homicide, which may have been either a .38 caliber or a nine-millimeter.   Barry Poindexter also saw appellant with a firearm shortly before the homicide, but could testify only that the gun was "medium sized."   David Green testified that while parked at the victim's home shortly before the homicide he saw a man, who may have been appellant, take a handgun from his truck, put it in his pocket, and walk into the residence.

---

[10] Petitioner told the police that, immediately prior to Harris going upstairs, he had gotten mad at Harris and "smacked a marijuana joint out of her mouth." (Trial Tr. 575.)   Petitioner stated that he had then driven around till he calmed down. (*Id.*)   Ms. Allen's testimony, however, does not suggest that Petitioner had calmed down by the time he returned to the apartment.   Petitioner further acknowledged that Harris "got upset with him as well because she had heard that he was messing with or involved with the young lady upstairs named Brown Eyes." (*Id.* at 576.)

[11] Ms. Allen clarified that Petitioner did not say MF, rather he "use[d] the word that we know to be associated with MF." (*Id.* at 262.)

12

No fingernail scrapings were extracted from Harris's hands for DNA testing. Her toxicology report showed a blood alcohol content of .21%. Harris also had a contusion on her face, a contusion on the left cheek, and bruising around the right eye. The injuries were caused within one or two days prior to death, and it was possible they were caused just prior to her death.

*Reyes*, No. 1660-05-2 at 5.

## C.     Lack of Evidence Corroborating Petitioner's Account

Despite diligent investigation the police did not find evidence to corroborate Petitioner's account of Harris's murder.

The ... evening [after the murder], Officers Charles Hanna and William Kuecker met with appellant. They drove to the location where appellant stated Harris had been shot in order to look for evidence. None was found. Specifically, they failed to locate glass from the windows that appellant claimed had been shattered in the gunfire. Later, when the officers interviewed appellant at the police station, he told the officers he previously owned two guns, but had sold them.

The following Saturday, appellant introduced the officers to Nayesha Blount, a woman he believed was acquainted with Buddy. She pointed out certain areas where Buddy might be located. However, she identified the man as "Barry," and from that point, appellant referred to him as Barry as well.

*Id.* at 3. Neither the police nor Petitioner has ever located a drug dealer named Buddy or Barry, who matched the description Petitioner provided the police.

Additionally, Norman Tiller, an expert in bloodstain analysis, testified for the prosecution. Tiller's testimony concerning the bloodstains on Petitioner's clothing from the night of the murder undermined Petitioner's version. Namely, when Petitioner encountered the police, he was wearing a long-sleeve black t-shirt inside-out. The interior of the shirt had a large bloody transfer stain, consistent with Petitioner's story

13

that he attempted to hug or comfort Harris after she had been shot.  However, at the very end of the left sleeve on the exterior of the shirt, if the shirt was worn properly, was another one-inch contact transfer stain.  Such testimony supported the theory that Petitioner shot Harris at close range, got blood on his sleeve, and then turned his shirt inside out to cover up this fact.[12]  Petitioner offers no innocent explanation as to how he had blood transfer stains on the interior and exterior of the shirt he was wearing on the night of the murder.

### D.  Evidence Tending to Show Flight

The prosecution introduced evidence that suggested Petitioner attempted to flee the state after Harris's murder.

> [Officer] Hanna had arranged to meet with appellant on April 29, 2004, but when [Officers Hanna and Kuecker] arrived at appellant's hotel he was no longer registered.  Hanna located appellant in Richmond, where Hanna observed him with Harris–Minor.  Hanna followed appellant to I–95, at which point Hanna asked Virginia State Police to stop appellant.  State Trooper Fred Boyd stopped appellant for failure to stop at a weigh station.  Appellant told the officer he put everything in his truck to move to Florida, where he had friends.
> On or about May 5, 2004, appellant approached an acquaintance, Edward Kearney, and offered him $200 as well as a Cadillac to drive the truck out of town.  Initially, appellant asked Kearney to take it to Georgia, but then said he wanted to go to Florida.  On or about the same day, Iretta King went to her daughter's house where she discovered appellant, her daughter, and another man loading her daughter's furniture onto a dump truck.  She asked appellant what they were doing.  He told her he was going to Florida to help her daughter find a job on a boat.
> The next day appellant met Kearney late in the morning, and the two began driving separate vehicles south on I–95.  The North Carolina Police stopped Kearney in Lumberton, North Carolina.  The officer asked whether

---

[12] Petitioner also had gunshot residue on his left hand.  (Trial Tr. 407.)

Kearney had appellant's cell phone number. They contacted appellant and told him his dump truck had been impounded. Appellant then began to return to Virginia, where police stopped him seven miles from the border.

*Id.* at 3–4.[13]

### E.    Petitioner's Evidence Which He Asserts Supports His Innocence

Much of the evidence Petitioner now relies upon to support his claim of innocence is the same evidence that the jury found unconvincing. For example, Petitioner suggests the forensic evidence supports his theory of innocence. Specifically, Petitioner notes that "[a]t the hospital, a forensic nurse photographed red marks on [his] upper back and shoulder, and abrasions on his face, hands, right wrist, and right elbow." *Reyes*, No. 1660–05–2 at 3. Petitioner contends these injuries, along with the gunshot residue on his left hand and nail scrapings of his right hand containing DNA from an unidentified third party, corroborate his story that he was struggling with a gunman in the back seat.[14] (Am. Mem. Law Actual Innocence ¶¶ 5, 6.) Petitioner also argues that the presence of a .380 bullet casing found in the pocket of the back rear passenger door supports his theory that the shooter was seated in the back seat. (*Id.* ¶ 6.)

---

[13] Petitioner attempted to suggest that he fled Virginia, not to avoid prosecution for Harris's murder, but because he feared for his life. To support this argument, Petitioner presented evidence that two of his vehicles had bullet holes in them. Petitioner's suggestion that he fled Virginia because someone had shot at him was not particularly credible given Petitioner's prior show of bravado and his failure to relay this fear during his regular interactions with the police.

[14] Petitioner claims that the gunshot residue on the left hand and the tissue from a third party under the nails of his right hand support his story that he struggled with Buddy over the gun. This same evidence tends to refute Petitioner's story that he continued to drive the car with one hand throughout the alleged struggle for the gun. (Am. Mem. Law Actual Innocence ¶ 5.)

15

Additionally, Petitioner contends the trajectory of the lethal bullet, which entered behind Harris's left ear and lodged just above her right ear, supports his claim of innocence. Petitioner is mistaken. If Harris had been struggling with the shooter from the front seat for control of the gun as Petitioner claimed, logically she would have been turned toward the shooter. Accordingly, the left side of Harris's head would have been turned away from the shooter. Thus, the trajectory of the bullet, the lack of any defensive wounds on Harris's arm, and the fresh contusions on Harris's face are consistent with the prosecution's theory that Petitioner battered Harris and then executed her.[15]

### IV. Analysis of Petitioner's New Evidence of Innocence

Petitioner's new evidence of innocence consists of a Certificate of Analysis dated April 24, 2008, which identifies Markee Welton White as a contributor to DNA found on a swab of the door handle from the vehicle in which Harris's body was found. (Mem. Law Actual Innocence (Dk. No. 47) Ex. E.) Citing a copy of a warrant for White's arrest, Petitioner notes that Markee White "lived in close proximity to the location of the crime and the location from which [Petitioner] stated he picked up the third party who killed [Harris]. (Exh E). Also notable is the fact that Markee White was arrested for distribution of drugs. (Exhibit F)." (Am. Mem. Law Actual Innocence ¶ 7.) Petitioner contends this evidence "clearly shows that a third person was in fact in the car." (*Id.*)

---

[15] Petitioner also points to the recovery of several fingerprints and one palm print from the vehicle that were not associated with Petitioner or the victim. Petitioner contends this evidence demonstrates that individuals beside Petitioner and the victim rode in the vehicle near the time of the homicide. (Supplemental Br. 7–9.)

The foregoing evidence hardly provides compelling evidence of Petitioner's innocence. Although Markee White is black (Mem. Law. Actual Innocence Exs. E, F), he fits neither Petitioner's description of Buddy nor of Buddy's companion. Markee White is a large individual, standing six foot one and weighing almost two hundred pounds. (*Id.* Ex. F.) Petitioner "described Buddy as a black male who was five six to five seven, 22 to 23 years of age; he had a stocky build, [and] he was clean shaven." (Trial Tr. 186.) Petitioner described Buddy's companion "as a black male, who was five foot ten; had dark skin; slim or skinny; that he was clean shaven; that he had on dark clothes; and what he described as a nappy afro." (*Id.*)

Furthermore, while Petitioner relies heavily on the presence of DNA from a third party on the vehicle as support for his story, no reliable proof exists as to when this DNA was left on the vehicle.[16] The record reflects that Harris regularly drove the vehicle. Further, the vehicle was not particularly clean. On the floor board behind the passenger seat, there was a framed halogen work light. (Trial Tr. 333.) On the passenger-side back seat, there were two red towels, and the pocket on the back seat was "full of papers and documents." (Trial Tr. 333–34.) Additionally, the police recovered jewelry and "a clump of hair," a beer bottle, marijuana, a black hat, and cigarette butts in the vehicle. (Trial Tr. 335-338.) Moreover, contrary to Petitioner's suggestion, the presence of a

---

[16] In his *pro se* submissions, Petitioner represents that "[t]he vehicle had been detailed only a few hours prior to the homicide." (Dk. No. 52 at 2.) Petitioner's counsel, however, concedes that "there is no evidence of this fact in the record." (Am. Mem. Law Actual Innocence ¶ 7.) Indeed, the record indicates that Harris had the vehicle at work and at her daughter's home in the hours leading up to the murder.

which contained Harris's DNA and that of an unidentified third party does not support his theory of innocence. (Mem. Law Actual Innocence Ex. D 2.) Petitioner never suggested that Harris and Buddy or his companion shared a cigarette. Thus, the presence of this cigarette butt dispels the notion that the vehicle had been recently cleaned and contained only the DNA of Petitioner, Harris, Buddy and Buddy's companion.

Considered in context, the presence of Markee White's DNA on the door handle does not constitute particularly "exculpatory" or "reliable" evidence of Petitioner's innocence. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995). Hence, the Court need not proceed to the second step of the inquiry and determine whether, in light of all of the evidence, "'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327–28). Nevertheless, Petitioner clearly has failed to meet that standard.

As recited above, there exists substantial evidence of Petitioner's guilt. Harris feared Petitioner. Petitioner wanted to marry Harris. Harris wanted to leave Petitioner. Immediately preceding her death, Petitioner was clearly angry at Harris. The bruising on Harris's face and the thump Ms. Allen heard are consistent with Petitioner striking Harris after Petitioner demanded that Harris "bring [her] MF on downstairs." (Trial Tr. 261.)

18

Harris was shot minutes later. The only reasonable conclusion is that Petitioner shot her, especially since Petitioner possessed a firearm similar to that used by the shooter.[17]

Petitioner has not produced any substantial evidence that Buddy exists, much less that Buddy or his companion shot Harris. Additionally, as recited above, Petitioner's version of the shooting was largely uncorroborated by any physical evidence.[18] Moreover, any reasonable juror would have difficulty crediting Petitioner's story about Harris's murder because Petitioner repeatedly changed the story and lied to the police about his relationship with Harris and his activities on the day of the crime. Petitioner fails to demonstrate that no reasonable juror would convict him in light of all the evidence. Petitioner's claim of actual innocence will be rejected. Claims I, III, and IV are procedurally defaulted and will be dismissed.

### V. Petitioner's Request to Amend His § 2254 Petition

In his Supplemental Brief, Petitioner seeks to add the following grounds for relief:

Claim One  "The Honorable Trial Court failed to uphold and protect
       Petitioner Jorge Luis Reyes, Sr.'s rights to a new trial, based
       upon the newly discovered evidence." (Supplemental Br.
       4.)[19]

---

[17] Petitioner conveniently claimed to have sold all of his guns in the weeks preceding Harris's murder. It strains credulity to believe that Petitioner would have sold all of his weapons when he claimed he feared for his life around the time of Harris's murder.

[18] For example, although Petitioner claimed he and Harris left the apartment to eat, the victim left her purse in the apartment and that purse contained both Harris's and Petitioner's identification cards and his phone.

[19] The Court has omitted the emphasis from the quotations of Claims One through Three.

Claim Two   "In effective [sic] assistance by counselor: Petitioner Reyes' counselor failed to petition the Honorable Circuit Court to guarantee the preservation of the forensic evidence until all appeals and Habeas Corpus proceedings had been exhausted." (*Id.* at 13.)

Claim Three   "Ineffective assistance by counselor: counselor failed to advise Petitioner Jorge Luis Reyes, Sr. (who is an immigrant from Cuba) of his rights under Article 36 of the Vienna Convention." (*Id.* at 18.)

"[H]abeas applications 'may be amended . . . as provided in the rules of procedure applicable to civil actions.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (omission in original) (quoting 28 U.S.C. § 2242). Under Federal Rule of Civil Procedure "15(a) leave to amend shall be given freely, absent bad faith, undue prejudice to the opposing party, or futility of amendment." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000) (citing cases). Leave to amend is appropriately denied as futile when the claims lack merit. That is the case here.

## A.   Claims One and Two

In Claims One and Two, Petitioner challenges the actions of the Circuit Court and his counsel in post-conviction proceedings in the Circuit Court. Specifically, in Claim One, Petitioner complains that, although on April 24, 2008 the Commonwealth identified Markee Welton White as a contributor to DNA found on a swab of the door handle from the vehicle in which police found Harris's body, the Commonwealth did not share this information with Petitioner until July 14, 2009. Petitioner suggests that this delay

20

violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963).[20] Petitioner, however,

fails to explain why this delay entitles him to federal habeas relief.

At the time of trial, the Commonwealth had not identified White as the contributor

of the DNA on the door handle.[21] To the extent Petitioner suggests that the

Commonwealth should have revealed White as the contributor of the DNA on the door

handle in sufficient time for Petitioner to move for a new trial, he fails to demonstrate

that the Commonwealth identified White as the contributor until many years after

Petitioner's conviction became final and the time for moving for a new trial had expired.

*See* Va. Sup. Ct. R. 1:1 (West 2005) ("All final judgments, orders, and decrees,

irrespective of terms of court, shall remain under the control of the trial court and subject

to be modified, vacated, or suspended for twenty-one days after the date of entry, and no

longer."). Furthermore, Petitioner fails to explain how a more prompt disclosure of

White as the contributor of the DNA on the door handle would have altered the

disposition of his state petition for a writ of habeas corpus that was pending before the

Supreme Court of Virginia in 2008. *See Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir.

1997) (concluding when exculpatory evidence is discovered after trial, petitioner must

---

[20] For purposes of this opinion only, the Court assumes that the duty to disclose under *Brady* extends to post-conviction proceedings. *Tennison v. City & Cnty. San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2009) (citing cases from the Second, Ninth, and Tenth Circuits).

[21] As of the time of Reyes's trial, the Commonwealth had not been able to identify the contributor to the DNA on the door handle. (Supplemental Br. Ex. 2A Item 42 (Certificate of Analysis dated February 22, 2005).) The record indicates that, on or about April 24, 2008, "[a] subsequent search of the DNA profile previously developed from the swab of [the] door handle" identified Markee Welton White as the contributor of the previously unidentified DNA. (*Id.* Ex. 2B, Certificate of Analysis dated April 24, 2008).

21

demonstrate a reasonable possibility that the delay in disclosure impacted the post-trial proceeding).  Thus, it would be futile to permit Petitioner to amend his § 2254 Petition to add Claim One.

In Claim Two, Petitioner faults counsel for failing to ensure that the Henrico Police Department preserved evidence following Petitioner's trial.  Petitioner notes that in "2008–2009, one of the detectives, Charles Hanna, destroyed several pieces of key evidence[22] *without a court order.*"  (Supplemental Br. 14.)  Petitioner contends that the destruction of this evidence violated his rights under *Arizona v. Youngblood*, 488 U.S. 51 (1988).  (*Id.* at 16.)  Such a claim contains multiple fatal flaws.

First, the police did not destroy the evidence until after the conclusion of Petitioner's trial and direct appeal.  Thus, he cannot demonstrate a violation of his rights under *Youngblood. Ferguson v. Roper*, 400 F.3d 635, 638 (8th Cir. 2005) ("*Youngblood* does not apply to evidence not . . . destroyed until after trial . . . ."); *see Lovitt v. True*, 403 F.3d 171, 187 (4th Cir. 2005) (suggesting that extension of the rule in *Youngblood* to post-appeal destruction of evidence "might impermissibly create a 'new rule' on federal habeas review" (citing *Caspari v. Bohlen*, 510 U.S. 383, 389–90 (1994); *Teague v. Lane*, 489 U.S. 288, 301 (1989)).  Second, counsel's alleged failure to prevent the destruction of the evidence does not implicate the Sixth Amendment because the destruction

---

[22] Petitioner did not identify the evidence in his Supplemental Brief.  Petitioner, however, provides a list of the evidence in an e-mail attached to his § 2254 Petition filed in *Reyes v. Kelly*, No. 3:11CV435 (E.D. Va.).  § 2254 Petition Ex. J-1, *Reyes v. Kelly*, No. 3:11CV435 (E.D. Va. filed July 6, 2011).

occurred at a time when Petitioner did not enjoy a constitutional right to counsel. *See*

*Mackall v. Angelone*, 131 F.3d 442, 449 (4th Cir. 1997).[23]  Accordingly, permitting

Petitioner to amend his § 2254 Petition to add Claim Two would be futile.

### B.    Claim Three

In Claim Three, Petitioner alleges that he did not receive effective assistance of

counsel because counsel failed to advise Petitioner of his right to consular assistance

under Article 36 of the Vienna Convention.[24]  Petitioner alleges:

---

[23] Petitioner also requests further DNA testing of some of the evidence recovered from the
vehicle in which Harris was murdered.  A habeas petitioner must demonstrate good cause before
he is allowed to conduct discovery. *Stephens v. Branker*, 570 F.3d 198, 213 (4th Cir. 2009), *cert.
denied*, 130 S. Ct. 1073 (2010). "A showing of good cause must include specific allegations
suggesting that the petitioner will be able to demonstrate that he is entitled to habeas corpus
relief," if the facts are fully developed. *Id.* (citing *Bracy v. Gramley*, 520 U.S. 899, 908-09
(1997)).  Petitioner simply has not satisfied this standard.  As reflected above, *see supra* Parts III,
IV, Petitioner fails to demonstrate that further testing of any materials from the vehicle would
result in reliable, persuasive proof of his innocence, much less demonstrate his entitlement to
federal habeas relief.

[24] Article 36 states, in pertinent part:

> 1. With a view to facilitating the exercise of consular functions relating to
> nationals of the sending State:
> (a) consular officers shall be free to communicate with nationals of the sending
> State and to have access to them. Nationals of the sending State shall have the
> same freedom with respect to communication with and access to consular officers
> of the sending State;
> (b) if he so requests, the competent authorities of the receiving State shall, without
> delay, inform the consular post of the sending State if, within its consular district,
> a national of that State *is arrested or committed to prison* or to custody pending
> trial or is detained in any other manner. Any communication addressed to the
> consular post by the person arrested, in prison, custody or detention shall also be
> forwarded by the said authorities without delay. The said authorities shall inform
> the person concerned without delay of his rights under this sub-paragraph;
> (c) consular officers shall have the right to visit a national of the sending State
> who is in prison, custody or detention, to converse and correspond with him and

23

> The authorities read the Petitioner Reyes his rights in English. Petitioner, due [to] his heavy accent, was obviously from a different country, and responded with broken English. His speech apparently was misunderstood and was later used again him (i.e., the supposed name change of "Buddy" to "Barry"). Petitioner was not informed of his right to consul[ar assistance].

(Supplemental Br. 22.) Petitioner, however, cannot demonstrate that he suffered any prejudice from counsel's failure to invoke Petitioner's right to consular assistance. Initially, the Court notes that Petitioner identified the shooter as Buddy or Barry, at times when Petitioner ostensibly was cooperating with the police and not arrested or detained. Therefore, the police had no duty to inform Petitioner of his right to consular assistance at that juncture. *See Breard v. Greene*, 523 U.S. 371, 376 (1998) (observing that "[t]he Vienna Convention . . . arguably confers on an individual the right to consular assistance *following arrest*") (emphasis added). Moreover, Petitioner fails to explain, much less demonstrate, how, after he was arrested, contact with the Cuban consulate could have resulted in his acquittal. *See United States v. Cardoso-Lopez*, 348 F. App'x 157, 160 (7th Cir. 2009) (emphasizing defendant's obligation to demonstrate prejudice flowing from any violation of his right to consular assistance). Accordingly, permitting Petitioner to amend his § 2254 Petition to add Claim Three would be futile because he cannot

---

> to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

*Sanchez-Llamas v. Oregon*, 548 U.S. 331, 339 n.1 (2006) (emphasis added) (quoting *Vienna Convention on Consular Relations*, Apr. 24, 1963, [1970] 21 U.S.T. 77, 100–01, T.I.A.S. No. 6820).

demonstrate prejudice.  Accordingly, Petitioner's request to amend his § 2254 Petition to add Claims One through Three will be denied.

## VI. Conclusion

Claims I, III, and IV are procedurally defaulted and will be dismissed. The petition for a writ of habeas corpus will be denied.  Petitioner's request to amend will be denied. The action will be dismissed.

An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(B).  A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  No law or evidence suggests that Petitioner is entitled to further consideration in this matter.  A certificate of appealability will therefore be denied.

An appropriate Order will accompany this Memorandum Opinion.

Date: July 9, 2012                              /s/
Richmond, Virginia                    HENRY E. HUDSON
                                      UNITED STATES DISTRICT JUDGE